Affirmed and Opinion filed August 26, 2008








Affirmed
and Opinion filed August 26, 2008.

 

 

In The

 

Fourteenth Court of
Appeals

_______________

 

NO. 14-07-00343-CV

_______________

 

ANGLO-DUTCH PETROLEUM INTERNATIONAL, INC. and
ANGLO-DUTCH (TENGE) L.L.C., Appellants

 

V.

 

GREENBERG PEDEN, P.C. and GERARD J. SWONKE, Appellees

                                                                                                                                               


On Appeal from the 61st District Court

Harris County, Texas

Trial Court Cause No. 2004-20712

                                                                                                                                                

 

O P I N I O N

Anglo-Dutch Petroleum International,
Inc. and Anglo-Dutch (Tenge) L.L.C. (collectively, AAnglo-Dutch@) appeal the trial court=s judgment in favor of Greenberg
Peden, P.C. and Gerard J. Swonke in connection with this fee dispute between a
client and an attorney.

We affirm the trial court=s judgment.








Overview

This appeal arises from a contingency
fee agreement dated October 16, 2000.  It is undisputed that the client,
Anglo-Dutch, entered the fee agreement.  It is undisputed that Anglo-Dutch=s president, Scott V. Van Dyke,
signed the fee agreement on behalf of Anglo-Dutch.  It is undisputed that the
attorney, Swonke, also signed the fee agreement.  It is hotly disputed whether
Swonke signed the fee agreement on behalf of himself individually or on behalf
of the Greenberg Peden law firm, where he was Aof counsel@ at the time.

Swonke contends he signed on behalf
of himself individually and can recover fees individually. Anglo-Dutch contends
Swonke signed on behalf of the law firm and cannot recover fees individually. 
Greenberg Peden disclaims rights to or interest in the disputed fees.  The law
firm assigned any interest under the October 16, 2000 fee agreement to Swonke;
released Anglo-Dutch from liability to Greenberg Peden for the disputed fees;
and acknowledged that Greenberg Peden is not entitled to receive money from Anglo-Dutch
under the agreement.

The trial court concluded that the
October 16, 2000 fee agreement is ambiguous with respect to the capacity in
which Swonke signed, and submitted that issue to the jury.  The jury sided with
Swonke on that issue, finding that he signed the fee agreement with Anglo-Dutch
on behalf of himself individually and not on behalf of Greenberg Peden.  The
jury further answered that Anglo-Dutch failed to comply with the fee agreement;
that Swonke complied with his fiduciary duty to his client Anglo-Dutch; and
that Van Dyke did not commit fraud against Swonke.  The jury awarded $1 million
as contract damages to Swonke for Anglo-Dutch=s failure to comply with the fee
agreement.  The trial court signed a final judgment in conformity with the jury=s findings awarding contract damages
and additional statutory attorney=s fees to Swonke.  See Tex.
Civ. Prac. & Rem. Code Ann. ' 38.001 (Vernon 2008).








Anglo-Dutch assails the trial court=s final judgment in favor of Swonke
on multiple grounds.  Resolution of Anglo-Dutch=s appellate challenges requires a
detailed discussion of the evidence adduced at trial and the circumstances
surrounding execution of the October 16, 2000 fee agreement.

Facts

Swonke joined Greenberg Peden as Aof counsel@ in 1987.[1] 
This status gave Swonke discretion to choose his clients and gave Greenberg
Peden a right of first refusal regarding clients and matters Swonke brought to
the firm.  Swonke remained as Aof counsel@ to Greenberg Peden until the firm dissolved in 2001.

The Aof counsel@ relationship between Swonke and
Greenberg Peden operated under a fee sharing agreement.  For matters accepted
by the firm, it billed Swonke=s time through the firm computer system and deducted a
percentage from Swonke=s fees; the size of the deduction depended on the fee
agreement with a particular client.  This deduction reimbursed Greenberg Peden
for Swonke=s use of office space, paralegals, secretaries, and parking.  Clients in
matters accepted by the firm paid their fees for Swonke=s time directly to Greenberg Peden,
which made appropriate deductions and then paid the balance to Swonke. 








Swonke met Van Dyke in 1987 at a
lunch with Van Dyke=s father while Van Dyke was working for his father=s company.  Van Dyke=s father asked Swonke to perform
legal work for the company.  Swonke already had joined Greenberg Peden as of
counsel at that point.  While Van Dyke was still working for his father, Van
Dyke and his father later asked about Swonke=s salary at Greenberg Peden because
they wanted to hire Swonke as in-house counsel for the father=s company.  Swonke responded that as Aof counsel@ he did not receive a salary from the
firm, but was paid only when clients paid; Swonke explained that he generated
his own work and sometimes made more money than at other times.  Van Dyke, his
father and Swonke decided to maintain their existing relationship, under which
Swonke performed legal work for the father=s company as Aof counsel@ at Greenberg Peden.  Swonke
testified that he also explained his Aof counsel@ status to Van Dyke and Van Dyke=s mother on several occasions.  Van
Dyke testified that he did not recall being told Swonke was Aof counsel@ to Greenberg Peden.

Van Dyke left his father=s company in 1998 and together with
his mother formed Anglo-Dutch Petroleum International, an oil and gas
exploration company.  Approximately four years later, Van Dyke asked Swonke to
perform legal work for Anglo-Dutch in connection with development of oil and
gas properties in an area known as the Tenge Field in Kazakhstan.  Swonke began
performing a substantial amount of legal work for Van Dyke and Anglo-Dutch in
1993.  This work focused on preparing documents addressing the participation of
multiple national and international investors in Anglo-Dutch=s Tenge Field project.  Swonke worked
with Greenberg Peden shareholder Skip Naylor to draft the elaborate documents
Van Dyke requested to bring investors together and create an entity called
Anglo-Dutch (Tenge) L.L.C.

In 1997, Anglo-Dutch invited
Halliburton Energy Services, Inc. and Ramco Oil & Gas, Ltd. to invest in
the Tenge Field project.  Anglo-Dutch hoped to use funds from these new
investors to buy out its existing investors.  To evaluate Anglo-Dutch=s proposal, Halliburton and Ramco
entered into confidentiality agreements with Anglo-Dutch and received
confidential data to review.  Swonke negotiated and drafted the confidentiality
agreements for Anglo-Dutch.

Anglo-Dutch ceased paying Greenberg
Peden=s bills at about this time and began
accumulating a large account payable to the firm.  Anglo-Dutch=s unpaid legal bills prompted
Greenberg Peden to stop working for Anglo-Dutch in 1999.  By early 2000,
Anglo-Dutch owed Greenberg Peden more than $200,000.  Swonke and Greenberg
Peden shareholder David Peden met with Van Dyke in 1999 or early 2000 to
discuss Anglo-Dutch=s unpaid legal bills.  Peden told Van Dyke that no Greenberg
Peden attorney would perform legal work for Anglo-Dutch until it paid its
accumulated legal bills to the firm. 

 








A dispute arose between Anglo-Dutch,
Halliburton and Ramco in early 2000 regarding breach of the Tenge Field
confidentiality agreements and disclosure of Anglo-Dutch=s confidential data.  Van Dyke asked
Swonke in February 2000 to evaluate the potential for a lawsuit against
Halliburton and Ramco for breach of the confidentiality agreements.  Swonke
advised Van Dyke that Anglo-Dutch had viable claims against both companies. 
Anglo-Dutch wanted to pursue the lawsuit but lacked financial resources to pay
an attorney on an hourly basis.  

Pursuant to Greenberg Peden=s right of first refusal, Swonke
asked the firm in February or March 2000 if it wanted to represent
Anglo-Dutch in a suit against Halliburton and Ramco arising from breaches of
the Tenge Field confidentiality agreements.  Greenberg Peden refused to
represent Ango-Dutch on an hourly or a contingency basis because of Anglo-Dutch=s unpaid bills and a history of
difficulty in collecting fees from Anglo-Dutch.  Thereafter, Swonke told
Van Dyke that Greenberg Peden would not represent Anglo-Dutch in a lawsuit
against Halliburton and Ramco due to Anglo-Dutch=s outstanding legal bills.  The bills
remained unpaid.[2]  Van Dyke did
not ask Swonke to represent Anglo-Dutch against Halliburton and Ramco at that
time.  

Because Greenberg Peden refused to
represent Anglo-Dutch in a suit against Halliburton and Ramco, Swonke referred
Van Dyke to several other law firms.  Anglo-Dutch signed a contingency fee
agreement with McConn & Williams in March 2000.  That firm filed a lawsuit
against Halliburton and Ramco in May 2000.  See generally Ramco Oil &
Gas Ltd. v. Anglo-Dutch (Tenge) L.L.C., 207 S.W.3d 801 (Tex. App.CHouston [14th Dist.] 2006, pet.
denied).








Van Dyke and attorneys from McConn
& Williams frequently asked Swonke for advice and help with tasks in
furtherance of the lawsuit against Halliburton and Ramco in the months that
followed this filing.  After providing unpaid legal assistance for months,
Swonke decided that he wanted compensation for time spent helping Anglo-Dutch
with its lawsuit against Halliburton and Ramco.  Swonke informed McConn &
Williams of his desire to be paid.  McConn & Williams said its fee interest
was not large enough for that firm to compensate him out of its interest.  Van
Dyke then called Swonke directly; asked him to help with the lawsuit; and
offered to pay him for doing so.  Van Dyke and Swonke negotiated the terms of
Swonke=s compensation for his participation
in Anglo-Dutch=s suit against Halliburton and Ramco.

Van Dyke proposed to pay Swonke based
on a contingency fee agreement because Anglo-Dutch could not afford an hourly
fee.  When Swonke suggested a flat percentage fee, Van Dyke responded by
insisting on a formula that would (1) incorporate a ratio of hours Swonke spent
to hours McConn & Williams attorneys spent, and then (2) multiply the 20
percent contingency fee contained in the McConn & Williams fee agreement by
that ratio.  Van Dyke thought this would be the only fair way to measure Swonke=s hours.  Swonke initially rejected
Van Dyke=s formula because he thought it was
too complicated; later, he acquiesced to using it with a rounding feature.

Swonke=s secretary typed the contingency fee
agreement negotiated by Van Dyke and Swonke on Greenberg Peden letterhead;
dated it October 16, 2000; and inserted the words AGreenberg Peden, P.C.@ in the signature block.  The letter=s opening paragraph states that it Amemorializes our agreement with
respect to me assisting you . . . and the law firm of McConn & Williams,
LLP@ regarding the suit against
Halliburton and Ramco.  In the next paragraph, the letter states that AI agree to assist Anglo-Dutch and
[McConn & Williams]  . . . in this lawsuit . . . .@  

Swonke signed the fee agreement=s signature block on October 16, 2000
and sent it to Van Dyke for signature the same day.  Van Dyke signed the fee
agreement on October 17, 2000 and returned it to Swonke.  








Van Dyke also sent a separate
transmittal letter to Swonke on October 17, 2000 with a copy of the McConn
& Williams contingency fee agreement.  In the transmittal letter=s second paragraph, Van Dyke states
that the McConn & Williams fee agreement Aprovides the basis for the Agreement
between Greenberg Peden P.C. and Anglo-Dutch.@  The transmittal letter was stamped Areceived@ by Greenberg Peden.  At the time of
receipt, Swonke did not respond to the transmittal letter; did not challenge
its reference to a fee agreement Abetween Greenberg Peden P.C. and
Anglo-Dutch;@ and did not assert that the fee agreement was between Anglo-Dutch and
Swonke individually.  Swonke did not examine or respond to Van Dyke=s letter at the time of receipt
because the letter transmitted the McConn & Williams fee agreement that
Swonke already had in his file.  Swonke testified that he normally would not
read a letter that refers to a document he already had in his files.

The Greenberg Peden firm dissolved on
October 1, 2001.  By that time, Swonke had worked 277 hours on Anglo-Dutch=s suit against Halliburton and
Ramco.  Swonke joined McConn & Williams as Aof counsel@ in October 2001 and informed
Anglo-Dutch that he was taking its files with him to McConn & Williams
unless Anglo-Dutch objected.  There was no objection.  Under his contract with
McConn & Williams, Swonke did not share in any McConn & Williams fees
for working on the Anglo-Dutch lawsuit against Halliburton and Ramco.  McConn
& Williams understood that Swonke had a separate fee agreement with
Anglo-Dutch in connection with the case.  Swonke worked another 1,022 hours on
Anglo-Dutch=s lawsuit as Aof counsel@ to McConn & Williams.

Several months after Swonke left
Greenberg Peden and joined McConn & Williams, Van Dyke was deposed in the
Halliburton and Ramco lawsuit.  At the deposition, Van Dyke testified that
Anglo-Dutch had two contingency fee agreements.  He testified that one such
agreement was with John O=Quinn, Jett Williams, and Luke McConn, and the other was with
Swonke.  Van Dyke did not identify any contingency fee agreement with Greenberg
Peden.








Anglo-Dutch=s lawsuit against Halliburton and
Ramco was tried for nine weeks beginning in August 2003.  Anglo-Dutch sought
more than $600 million in damages.  See Ramco Oil & Gas Ltd., 207
S.W.3d at 806-07.  The jury found that Halliburton and Ramco breached their
respective confidentiality agreements with Anglo-Dutch.  The jury awarded
Anglo-Dutch $64 million in lost profits for Halliburton=s breach of its confidentiality
agreement and $6.4 million in lost profits for Ramco=s breach of its confidentiality
agreement.  The parties stipulated to $9.8 million in reasonable and necessary
attorney=s fees, which included the 1,022
hours Swonke spent working on the lawsuit while at McConn & Williams.








Anglo-Dutch settled with Halliburton
on April 1, 2004 for $51 million.[3]  After Swonke
learned of the settlement, he sent an e-mail to Van Dyke on April 7, 2004
reminding him that the October 16, 2000 fee agreement required a comparison of
Swonke=s hours to those billed by McConn
& Williams.  Swonke sent another e-mail to Van Dyke the same day setting
forth the total number of hours he worked on the lawsuit.  Swonke=s email asserted his entitlement to
three percent of the settlement amount according to Swonke=s calculations.  Van Dyke responded
to Swonke=s email on April 13, 2004. Van Dyke said he had lost his voice and agreed
that he and Swonke needed to discuss Swonke=s situation.  Swonke replied, asking
Van Dyke to call him when he felt well enough to speak and inquiring whether
Van Dyke received a memorandum Swonke sent him providing examples of work
Swonke performed in furtherance of the lawsuit.  The record does not reflect a
written response by Van Dyke to this inquiry.

The final Halliburton settlement
documents were signed on April 15, 2004.  At Van Dyke=s request, Swonke=s name was removed from the wiring
instructions given to Halliburton.  Swonke e-mailed Van Dyke that afternoon to
note that Swonke=s wiring instructions were not included with those of other
attorneys who had worked on the lawsuit.  Swonke asked Van Dyke how he wanted
to handle payment of Swonke=s fees.  In the meantime, attorneys at McConn & Williams
asked Swonke to not force the fee issue with Van Dyke until after the
settlement was funded and completed, fearing it could jeopardize the
settlement.

On April 16, 2004, Swonke e-mailed
Van Dyke to congratulate him on receiving a $30 million portion of the
Halliburton settlement.  Swonke asked Van Dyke to address payment of Swonke=s fees.  Swonke said he would fax to
Van Dyke a release signed by Greenberg Peden, which Van Dyke had requested.  In
that document, the law firm assigned any interest under the October 16, 2000
fee agreement to Swonke and released Anglo-Dutch from liability to Greenberg
Peden for fees under that agreement.

On April 19, 2004, attorneys Luke
McConn and Edward Crain wrote letters to Van Dyke at Swonke=s request in support of Swonke.  Both
stated that Swonke=s assistance had been invaluable in prosecuting the suit
against Halliburton, and that Swonke=s submitted hours were fair and
reasonable.  Swonke also faxed a letter to Van Dyke on that date further
explaining his hours and offering an audit of his hours.  Van Dyke and Swonke
set up a meeting for April 22, 2004 to discuss Swonke=s fee request.








On April 20, 2004, Van Dyke met with
attorney Sandy Dow to get a Afresh look@ at Swonke=s fee request.  Swonke subsequently met with Van Dyke and his
mother as scheduled at 8 a.m. on April 22, 2004.  At the April 22 meeting, Van
Dyke challenged the number of hours Swonke claimed to have worked on the
lawsuit and the language of the Greenberg Peden release.  Van Dyke asserted at
this meeting that Anglo-Dutch entered the October 16, 2000 fee agreement with
Greenberg Peden C not with Swonke individually.  The  meeting concluded
without resolution of the fee dispute.  

After meeting with Van Dyke, Swonke
returned to his office and sent an email at 9:08 a.m. to Van Dyke and other
recipients.  The email stated that Swonke no longer would represent Van Dyke or
his companies.

After meeting with Swonke, Van Dyke
met with attorney Sandy Dow for about two hours.  Dow=s billing records for April 22, 2004
describe the activity at this meeting as follows:  AOffice conferences with Scott Van
Dyke regarding claims of Gerard Swonke; Draft, review and revise
Plaintiff=s Original Petition.@  At 2:52 p.m. that day, Anglo-Dutch filed a suit against
Swonke and Greenberg Peden seeking a declaratory judgment in connection with
the October 16, 2000 fee agreement.

Anglo-Dutch asked for a declaration
that the fee agreement is between Anglo-Dutch and Greenberg Peden.  Anglo-Dutch
also asserted that Swonke breached the fiduciary duties he owed as an attorney
to client Anglo-Dutch, and requested fee forfeiture.  Swonke later filed a
counterclaim seeking a declaration that the fee agreement is between
Anglo-Dutch and Swonke individually.  Swonke also asserted claims for breach of
contract against Anglo-Dutch, and for fraud against Anglo-Dutch and Van Dyke
individually.

The jury returned a verdict after a
two-week trial.  In answer to Question 1, the jury found that the fee agreement
with Anglo-Dutch was entered into on behalf of Swonke individually and not on behalf
of Greenberg Peden.  In answer to Question 2, the jury found that Anglo-Dutch
failed to comply with the fee agreement.  The jury awarded $1,000,000 to Swonke
in Question 3 for his damages resulting from Anglo-Dutch=s failure to comply with the fee
agreement.  The jury answered Ayes@ to Question 5 asking if Swonke complied with his fiduciary
duty to Anglo-Dutch.  The jury answered Ano@ to Question 9 asking if Van Dyke
committed fraud against Swonke.[4]  








The trial court signed a final
judgment in conformity with the jury=s verdict on January 22, 2007,
ordering that Anglo-Dutch and Van Dyke take nothing from Swonke and Greenberg
Peden; that Swonke and Greenberg Peden take nothing on their fraud and
exemplary damages claims from Anglo-Dutch and Van Dyke; and that Anglo-Dutch
pay Swonke $1,000,000 and prejudgment interest on that amount totaling
$226,924.50.  As agreed by the parties, the trial court held an evidentiary
hearing on the issue of attorney=s fees.  The trial court ordered that
Anglo-Dutch pay Swonke $352,892.50 in attorney=s fees for the prosecution of his
breach of contract claim and for defense of the declaratory judgment claims. 
Following denial of its post-trial motions, Anglo-Dutch timely filed a notice
of appeal from the trial court=s final judgment.








On appeal, the main dispute centers
on whether Anglo-Dutch contracted with Greenberg Peden or with Swonke
individually when Anglo-Dutch and Swonke signed the October 16, 2000 fee
agreement.  Anglo-Dutch approaches this issue from several angles, contending
that (1) the fee agreement unambiguously is between Anglo-Dutch and Greenberg
Peden, and should be construed that way as a matter of law; (2) any ambiguity
in the fee agreement should be construed against the drafter, attorney Swonke;
(3) the evidence is legally and factually insufficient to support the jury=s finding that the fee agreement is
between Anglo-Dutch and Swonke individually; and (4) the evidence is legally
and factually insufficient to support the jury=s finding that Swonke complied with
his fiduciary duty.  Anglo-Dutch also challenges the correctness of the trial
court=s jury charge and certain evidentiary
rulings during trial.[5] 

Standards of Review

A.        Contract
Interpretation

Determining whether a contract is
ambiguous is a question of law subject to de novo review on appeal.  Bowden
v. Phillips Petroleum Co., 247 S.W.3d 690, 705 (Tex. 2008).  To determine
whether a contract is ambiguous, we look at the agreement as a whole in light
of the circumstances present when the parties entered the agreement.  David
J. Sacks, P.C. v. Haden, No.  07-0472, 2008 WL 2702184, at *3 (Tex.  July
11, 2008). 

B.        Legal
and Factual Sufficiency of the Evidence

We apply the standard and scope of
review for legal sufficiency of the evidence discussed in City of Keller v.
Wilson, 168 S.W.3d 802 (Tex. 2005).  After City of Keller, it is
difficult to make general pronouncements about the scope of review for a legal
sufficiency challenge.  The better course is to focus on the specific type of
legal sufficiency challenge that is being made; this, in turn, frames the scope
of review for appeal. 

City of Keller endorsed Chief Justice Calvert=s description of legal sufficiency
challenges.  ANo-evidence@ challenges may be sustained only when the record discloses
one of the following situations: (a) a complete absence of evidence of a vital
fact; (b) the court is barred by rules of law or of evidence from giving weight
to the only evidence offered to prove a vital fact; (c) the evidence offered to
prove a vital fact is no more than a mere scintilla; or (d) the evidence
establishes conclusively the opposite of the vital fact.  Id. at 810 
(citing Robert W. Calvert, ANo Evidence@ and AInsufficient Evidence@ Points of Error,@ 38 Tex. L. Rev. 361, 362-63
(1960)).  








We must consider evidence in the
light most favorable to the verdict, and indulge every reasonable inference
that would support it.  City of Keller, 168 S.W.3d at 822.  If the
evidence allows only one inference, neither jurors nor the reviewing court may
disregard that evidence.  Id.  AThe traditional scope of review does
not disregard contrary evidence in every no evidence review if there is no
favorable evidence (situation (a) above), or if contrary evidence renders
supporting evidence incompetent (situation (b) above) or conclusively establishes
the opposite (situation (d) above).@  Id. at 810-11.  If the
evidence at trial would enable reasonable and fair‑minded people to
differ in their conclusions, then jurors must be allowed to do so.  Id.
at 822.  Accordingly, the ultimate test for legal sufficiency always must focus
on whether the evidence would enable reasonable and fair‑minded jurors to
reach the verdict under review.  Id. at 827.  Legal sufficiency review
in the proper light must credit favorable evidence if reasonable jurors could
do so, and must disregard contrary evidence unless reasonable jurors could not
do so.  Id.  The reviewing court cannot substitute its judgment for that
of the trier of fact if the evidence falls within this zone of reasonable
disagreement.  Id.  at 822. 

In reviewing factual sufficiency, we
must consider and weigh all the evidence.  Golden Eagle Archery, Inc. v.
Jackson, 116 S.W.3d 757, 761 (Tex. 2003).  We can set aside a verdict only
if the evidence is so weak or if the finding is so against the great weight and
preponderance of the evidence that it is clearly wrong and manifestly unjust.  Id.  


For both legal and factual
sufficiency review, the jury is the sole judge of the credibility of the
witnesses and the weight to be given to their testimony.  City of Keller,
168 S.W.3d at 819; Golden Eagle Archery, Inc., 116 S.W.3d at 761. 

C.        Charge
Instructions








We review a trial court=s decision to submit or refuse a particular
instruction under an abuse of discretion standard.  Dew v. Crown Derrick
Erectors, Inc., 208 S.W.3d 448, 456 (Tex. 2006). A party is entitled to a
jury question, instruction, or definition on an issue raised by the pleadings
and evidence.  Tex. R. Civ. P. 278; Dew, 208 S.W.3d at 456. The trial
court enjoys wide discretion in framing a jury charge and is given broad
latitude to determine the propriety of explanatory instructions and
definitions.  H. E. Butt Grocery Co. v. Bilotto, 985 S.W.2d 22, 23 (Tex.
1998).  A trial court=s error in refusing an instruction is reversible if that
refusal probably caused the rendition of an improper judgment.  Tex. R. App. P.
44.1; Dew, 208 S.W.3d at 456. 

D.        Admission
of Evidence

We review a trial court=s decision to admit or exclude
evidence for abuse of discretion. In re J.P.B., 180 S.W.3d 570, 575
(Tex. 2005).  A trial court abuses its discretion in admitting or excluding
evidence if it acts without reference to any guiding rules and principles, or
if the act complained of is arbitrary and unreasonable.  Carpenter v.
Cimarron Hydrocarbons Corp., 98 S.W.3d 682, 687 (Tex. 2002). We must uphold
a trial court=s evidentiary ruling if there is any legitimate basis in the record to
support it.  Owens‑Corning Fiberglas Corp. v. Malone, 972 S.W.2d
35, 43 (Tex. 1998).  We will not reverse a trial court for an erroneous
evidentiary ruling unless the error was reasonably calculated to cause and
probably did cause the rendition of an improper judgment.  See Tex. R.
App. P. 44.1; see also Gee v. Liberty Mut. Fire Ins. Co., 765 S.W.2d
394, 396 (Tex. 1989). A successful challenge to evidentiary rulings usually
requires the complaining party to show that the judgment turns on the
particular evidence excluded or admitted.  City of Brownsville v. Alvarado,
897 S.W.2d 750, 753‑54 (Tex. 1995).

Analysis

A.        The
Fee Agreement is Ambiguous

Anglo-Dutch first argues that the
trial court erred by allowing the jury to interpret the fee agreement because
it unambiguously is between Anglo-Dutch and Greenberg Peden _ not between Anglo-Dutch and Swonke
individually.  We reject Anglo-Dutch=s contention because we agree with
the trial court=s determination that the fee agreement is ambiguous with
respect to whether Swonke contracted for himself individually or for Greenberg
Peden. 








Our primary concern when interpreting
a contract is to ascertain and give effect to the intent of the parties as that
intent is expressed in the contract.  Perry Homes v. Cull, No.  05-0882,
2008 WL 1922978, at *16 (Tex.  May 2, 2008).  The contract=s language is the primary evidence of
that intent. Id.  We examine and consider the entire writing in an
effort to harmonize and give effect to all the provisions of the contract so
that none will be rendered meaningless.  Seagull Energy E & P, Inc. v.
Eland Energy, Inc., 207 S.W.3d 342, 345 (Tex. 2006).  

To determine whether a contract is
ambiguous, we look at the agreement as a whole in light of the circumstances
present when the parties entered into the agreement.  David J. Sacks, P.C.,
2008 WL 2702184, at *3 (contract for legal services was not ambiguous and
unenforceable as written because it only could be reasonably interpreted as
setting forth agreement that client agreed to pay law firm hourly fee and
contained no cap on fees); Enter.  Leasing Co.  v.  Barrios, 156 S.W.3d
547, 549 (Tex.  2004).  A contract is unambiguous if it can be given a definite
or certain meaning.  SAS Inst., Inc. v. Breitenfeld, 167 S.W.3d 840, 841
(Tex. 2005).  

If the contract is subject to two or
more reasonable interpretations, then the contract is ambiguous and the jury is
entitled to resolve the fact issue concerning the parties= intent.  J.M. Davidson, Inc. v.
Webster, 128 S.W.3d 223, 229 (Tex. 2003); Columbia Gas Trans.  Corp. 
v.  New Ulm Gas, Ltd., 940 S.W.2d 587, 589 (Tex. 1996).  An ambiguity can
be patent or latent.  E.g., Friendswood Dev. Co. v. McDade & Co.,
926 S.W. 2d 280, 282 n.1 (Tex.  1996).  A patent ambiguity is evident on the
contract=s face.  Id.  at 282.  A
latent ambiguity arises from a collateral matter when a contract that appears
to be unambiguous on its face is applied to its subject.  Id.  at
282-283.

We begin with the October 16, 2000
fee agreement, which reads in its entirety as follows:

Dear Scott:

 








This letter memorializes our agreement with respect to
me assisting you and/or the companies which you control (Anglo-Dutch) and the
law firm of McConn & Williams, LLP regarding the above-reference matter.

 

In that regard, you have executed a Fee Agreement with
the law firm of McConn & Williams on March 25, 2000, which is incorporated
herein by reference.  I agree to assist Anglo-Dutch and that firm in this
lawsuit for proportionately the same percentage (20%) of any benefit to McConn
& Williams reflected in such agreement.  However, I will not be responsible
for any expenses other than those I may personally incur.  Further, the
proportions under which my fees shall be calculated will be the ratio of the
hours I have spent or will spend on this matter relative to the hours the
attorneys at McConn & Williams have spent or will spend after the date the
lawsuit was filed, rounded to the next whole percentage.  For example, if
McConn & Williams= attorneys spend 1,000 hours on the lawsuit after the
date the lawsuit was filed and I spend 90 hours of my time towards the lawsuit,
then by rounding up to nearest whole number, I would be entitled to receive
from you 2% (10% of 20%) of the gross revenues and other benefits recovered, if
any, from this lawsuit.  In addition, should the Fee Agreement be amended, you
agree that I shall be entitled to the benefit of such amendment.

 

If this comports with your understanding of our
agreement, please indicate by signing below and returning this letter to me.

 

If you have any questions, please contact me.

 

Very truly yours,

GREENBERG PEDEN P.C.

/s/

GERARD J. SWONKE

 

Anglo-Dutch contends the fee
agreement is an unambiguous contract between Greenberg Peden and Anglo-Dutch,
stressing that it is printed on Greenberg Peden letterhead.  Swonke=s address, telephone and fax number
are not included.  Swonke signed under the AGreenberg Peden P.C.@ signature block.  








For his part, Swonke stresses that
the agreement=s text does not reference Greenberg Peden.  The fee agreement refers five
times to McConn & Williams by name but never says Greenberg Peden will
perform legal services for Anglo-Dutch.  Swonke also highlights multiple
references to himself individually.  The letter refers to Aour agreement with respect to me
assisting you and/or the companies which you control (Anglo-Dutch).@  It continues with AI agree to assist,@ AI will,@ AI may,@ Amy fees,@ AI have spent,@ AI spend 90 hours of my time . . .  I
would be entitled to receive from you,@ A I shall be entitled,@ and concludes with AIf this comports with your
understanding of our agreement.@

The circumstances surrounding
formation of the fee agreement also bear on this issue. See Enter. Leasing
Co., 156 S.W.3d at 549.  Anglo-Dutch points to the following circumstances:
(1) Anglo-Dutch had a longstanding relationship with Greenberg Peden; (2) the
personal pronouns used throughout the fee agreement are consistent with hiring
Greenberg Peden while specifying which Greenberg Peden attorney would perform
the work; and (3) Van Dyke=s October 17, 2000 transmittal letter demonstrates his belief
that the fee agreement was between Anglo-Dutch and Greenberg Peden. 

Swonke emphasizes other circumstances
surrounding execution of the fee agreement. The fee agreement was signed
against a backdrop that included (1) previous explanations dating back at least
a decade regarding the nature of Swonke=s Aof counsel@ status at Greenberg Peden; (2)
Greenberg Peden=s refusal to perform work for Anglo-Dutch since 1999 due to
unpaid legal bills; and (3) Greenberg Peden=s specific refusal to represent
Anglo-Dutch on an hourly or a contingency fee basis in its suit against
Halliburton and Ramco, again due to unpaid legal bills.  Van Dyke acknowledged
that after 1999, no Greenberg Peden attorney had performed legal work for
Anglo-Dutch.  Van Dyke admitted that Swonke informed him of the firm=s refusal to represent Anglo-Dutch in
the lawsuit against Halliburton and Ramco due to Anglo-Dutch=s unpaid legal bills.








We reject Anglo-Dutch=s contention that the October 16,
2000 letter agreement unambiguously establishes a contract between Anglo-Dutch
and Greenberg Peden in light of the letter=s content and the circumstances
surrounding its execution.  The use of Greenberg Peden letterhead and the
inclusion of AGreenberg Peden P.C.@ in the signature block reasonably suggest a contract with
the law firm rather than an individual attorney.  But the absence of any
reference to Greenberg Peden in the letter=s body _ combined with Swonke=s exclusive use of personal pronouns
in the letter after the law firm repeatedly and emphatically told Van Dyke it
would not represent Anglo-Dutch _ reasonably suggest a contract with Swonke
individually.  These circumstances render the fee agreement ambiguous and give
rise to a fact issue.  The trial court properly submitted that fact issue to
the jury for resolution.

This conclusion should not be
misconstrued as a holding that any appearance of personal pronouns in an
engagement letter or fee agreement creates ambiguity about whether the client
hired a law firm or an individual lawyer.  It usually will be clear when a
client hired a law firm with an expectation that particular lawyers at the firm
would work on a particular matter.  However, an ambiguity exists in this case due
to conflicting indications on the fee agreement=s face combined with the law firm=s prior express refusals to represent
Anglo-Dutch, which refusals were communicated directly to Van Dyke.  Regardless
of whether the ambiguity is characterized as Apatent@ or Alatent,@ an ambiguity exists.  

Anglo-Dutch cannot change this
conclusion by pointing to the October 17, 2000 transmittal letter Van Dyke sent
to Swonke.  As noted earlier, the transmittal letter states as follows: AThis fee agreement with McConn &
Williams, LLP provides the basis for the Agreement between Greenberg Peden P.C.
and Anglo-Dutch.@  Even assuming for argument=s sake that a separate letter signed after
execution of the fee agreement can be considered as part of the
circumstances existing when the fee agreement was executed, the
transmittal letter merely underscores the existence of an ambiguity in the fee
agreement. 

After examining the fee agreement as
a whole and the circumstances present when the parties signed it, we hold that
the fee agreement is ambiguous and that the trial court properly submitted a
question asking the jury to determine the identity of the contracting parties.

We overrule Anglo-Dutch=s first issue.

 








B.        Determining
Which Parties Entered the Ambiguous Fee Agreement

Anglo-Dutch next argues that the
trial court should have construed the fee agreement against Swonke because (1)
any ambiguities in attorney-drafted fee agreements should be construed strictly
against the attorney-drafter; and (2) there is legally and factually
insufficient evidence to support the jury=s finding that Swonke is a party to the
fee agreement and Greenberg Peden is not.

The fact finder usually is tasked
with weighing evidence of the parties= intent and choosing among competing
interpretations of an ambiguous contract. See Columbia Gas Transmission
Corp., 940 S.W.2d at 589.  However, ambiguities sometimes are construed in
favor of one contracting party over another to address disparities in
negotiating power or to promote public policy goals.  See, e.g., Fiess v.
State Farm Lloyds, 202 S.W.3d 744, 746 (Tex. 2006) (if an exclusion in an
insurance contract has more than one reasonable interpretation, it will be
construed in favor of the insured).

Anglo-Dutch acknowledges that Texas
has not  adopted a blanket rule construing all ambiguities in contingency fee
agreements against the attorney and in favor of the client.  Anglo-Dutch
nevertheless invites this court to construe the ambiguous October 16, 2000 fee
agreement against Swonke.  

1.         Should
the ambiguous fee agreement be construed against Swonke?

a.         Contra
proferentum








Anglo-Dutch invokes the doctrine of contra
proferentum to advocate strict construction of the fee agreement against
Swonke.  Under this doctrine, an ambiguous contract will be interpreted against
its drafter.  See, e.g., Evergreen Nat=l Indem. Co. v. Tan It All, Inc, 111 S.W.3d 669, 677 (Tex. App.CAustin 2003, no pet.) (if insured=s interpretation of ambiguous policy
provision is reasonable, it will be adopted even if insurer=s interpretation is objectively more
sensible, as long as insured=s construction is not unreasonable).  Courts employ this
doctrine as a device of last resort when construing ambiguous contracts; it
essentially operates as a tie-breaking device to prevent arbitrary decisions.  Id.

Anglo-Dutch acknowledges that Texas
case law has not applied this doctrine in blanket fashion to all ambiguities in
attorney-client fee agreements.  Anglo-Dutch nonetheless argues that recent
Texas Supreme Court decisions suggest a preference for strictly construing
ambiguities in fee contracts against the attorney and in favor of the client. 
We analyze the cases cited by Anglo-Dutch in light of its assertion.

In Hoover Slovacek LLP v. Walton,
206 S.W.3d 557, 559 (Tex. 2006), Walton hired attorney Parrott of Hoover
Slovacek to recover royalties from oil and gas companies operating on his
ranch.  Under the fee agreement, Hoover Slovacek was entitled to a 30 percent
contingent fee for all claims on which collection was achieved.  Id. 
The fee agreement also included a provision stating that, in the event the firm
was discharged before completing the representation, Walton immediately had to
pay a fee equal to the present value of the firm=s interest in Walton=s claim.  Id.








Parrott negotiated settlements with
Texaco and El Paso Natural Gas, and Walton paid the firm its contingent fee. 
Parrott then turned to Walton=s claims against Bass Enterprises Production Company, and
Walton authorized Parrott to settle for $8.5 million.  Id.  Parrott=s initial settlement demand was for
$58.5 million.  A month later, Bass offered $6 million not only to settle
Walton=s claims, but also to acquire surface
estates of eight sections of Walton=s ranch.  Id.  Walton refused
to sell, authorized Parrott to  settle Walton=s claims for unpaid royalties for $6
million, and expressed his discontent with Parrott for not consulting Walton
before making the $58.5 million settlement demand.  Id. at 559-60.  When
Parrott responded by urging Walton to sell part of his ranch, Walton discharged
Parrott and hired Andrews & Kurth LLP.  Id. at 560.  That firm
settled Walton=s claims against Bass for $900,000.  Id.  In the meantime, Hoover
Slovacek demanded that Walton pay $1.7 million under the fee agreement.  Hoover
Slovacek contended that Bass=s $6 million offer and Walton=s subsequent authorization to settle
for that amount established the present value of Walton=s claims at the time of discharge.  Id.

The court examined whether the
termination fee provision was contrary to public policy.  Id. at
561-66.  It concluded that the firm=s provision penalized Walton for
changing counsel; granted the firm an impermissible proprietary interest in
Walton=s claims; shifted the risks of
representation almost entirely to Walton=s detriment; and subverted several
policies underlying the use of contingent fees.  Id. at 566.  Thus, the
court determined that it was unenforceable because it was unconscionable as a
matter of law, severed the termination provision, and held the remainder of the
fee agreement was enforceable.  Id.

In Lopez v. Munoz, Hockema &
Reed, L.L.P., 22 S.W.3d 857, 859 (Tex. 2000), the Lopezes hired Munoz,
Hockema & Reed to represent them in a wrongful death suit against
Westinghouse Electric Corporation.  Their contingency fee agreement assigned 40
percent  of any recovery to the firm, and 45 percent if the case Ais appealed to a higher court.@  Id. After a $25 million jury
verdict in favor of the Lopezes, the parties began settlement negotiations. Id. 
The parties tentatively agreed to a settlement, but Westinghouse filed a cash
deposit in lieu of a cost bond with the trial court to perfect an appeal in
case the settlement fell through.  Id.  When the firm met with the
Lopezes to discuss the settlement and the firm=s fees, the firm explained that its
fee would be 45 percent of the recovery.  No one objected at the time.  Id.
at 859-60.  The Lopezes signed a settlement statement reflecting the firm=s 45 percent fee and the funds were
distributed.  Id. at 860.








Three years later, the Lopezes sent
the firm a letter asking the firm to refund the additional five percent fee.  Id. 
When the firm refused, the Lopezes sued the firm alleging a breach of contract
claim.  Id.  They argued that the phrase Aappealed to a higher court@ was ambiguous and should be
construed against its drafter, the firm.  Id.  However, the court held
that the contract language is unambiguous because it can be given a definite
legal meaning and it is not reasonably susceptible to more than one meaning.  Id.
at 861.  By filing a cash deposit to perfect an appeal, the court found
that an appeal had been Ataken@ and the appellate court=s jurisdiction had been invoked under
a plain reading of the appellate rules.  Id.  The court concluded that
the unambiguous contract would be enforced as written.  Id.  at 862. 
Accordingly, because the case was appealed to a higher court when Westinghouse
perfected its appeal, the firm did not breach the contract by charging the
additional appeal fee.  Id.

Justice Gonzales dissented in Lopez
and argued that the phrase Aappealed to a higher court@ is ambiguous and should have been
construed against the attorneys.  Id. at 865.  Justice Gonzales
acknowledged that, when the objective meaning of a contract term is ambiguous,
the parties= subjective meaning of the term becomes a fact question.  Id. 
Nonetheless, he advocated that the special relationship between an attorney and
client as well as the attorney=s superior understanding of contract terms generally require
an ambiguous contract to be construed against the attorney-drafter.  Id.
at 866. 

Finally, in Levine v. Bayne, Snell
& Krause, Ltd., 40 S.W.3d 92, 93 (Tex. 2001), the Levines agreed to pay
their attorneys Aone-third of any amount received by settlement or recovery
from their lawsuit@ for foundation damage.  The Levines= $243,644 award was offset to
extinguish their mortgage obligation, giving them clear title and resulting in
a net recovery of $81,792.62.  Id.  A dispute arose regarding
computation of fees before or after the offset.  Id.  The court sided
with the Levines and held that Aany amount received@ meant net recovery.  Id. at
95.  The court reasoned that, because the attorney is better able to
predict and provide for fee arrangements, the burden should fall on the
attorney to express in the agreement with the client whether the contingent fee
will be calculated on non-cash benefits as well as money damages.  Id. 
In Levine, there was no contract ambiguity and the court did not discuss
or apply the doctrine of contra proferentum. 

These cases do not establish that
Texas law requires an ambiguity concerning the identity of parties to a fee
agreement to be resolved against the attorney.  








Hoover Slovacek does not apply here because it
addresses whether a fee agreement=s termination provision is
unconscionable and unenforceable.  Hoover Slovacek, 206 S.W.3d at 559. 
It did not decide whether contra proferentum should be applied to
construe an ambiguous fee agreement against the attorney-drafter.

In Lopez, Justice Gonzalez
argued in dissent that the fee agreement was ambiguous and should be construed
against the attorney-drafter because of the special relationship between
attorney and client. Lopez, 22 S.W.3d at 866.  No subsequent Texas
Supreme Court case has acted on the Lopez dissent=s urging to adopt a broad contra
proferentum rule for attorney-client fee contracts. 

Levine placed a burden on attorneys to
express clearly the contemplated computation in fee agreements.  40 S.W.3d at
95.  That decision did not address an ambiguity concerning the identity of
parties to a fee agreement, and it did not adopt a contra proferentum rule
for all ambiguities in all attorney-client fee agreements.  

Given the absence of definitive
teaching from the Texas Supreme Court, we look for guidance on this issue from
comment h to section 18 of the Restatement
(Third) on The Law Governing Lawyers.  Both sides invoke comment h in
favor of their respective positions.  Comment h provides in pertinent part:

Construction of client-lawyer contracts.  Under this
Section, contracts between clients and lawyers are to be construed from the
standpoint of a reasonable person in the client=s circumstances.  The lawyer thus bears the burden of ensuring that the
contract states any terms diverging from a reasonable client=s expectations.  The principle applies to fee terms .
. . as well as other terms.  

*                                  *                                  *








Many tribunals have expressed the principle as a rule
that ambiguities in client-lawyer contracts should be resolved against
lawyers.  That formulation can be taken to mean that the principle comes into
play only when other means of interpreting the contract have been
unsuccessful.  Under this Section, the principle that the contract is construed
as a reasonable client would understand it governs the construction of the contract
in the first instance.  However, this Section does not preclude reliance on the
usual resources of contractual interpretation such as the language of the
contract, the circumstances in which it was made, and the client=s sophistication and experience in retaining and
compensating lawyers or lack thereof.  The contract is to be construed in light
of the circumstances in which it was made, the parties= past practice and contracts, and whether it was truly
negotiated.  When the reasons supporting the principle are inapplicableCfor example, because the client had help of its own
inside counsel or another lawyer in drafting the contractCthe principle should be correspondingly relaxed.

 

Restatement
(Third) of The Law Governing Lawyers ' 18 cmt. h (1998).  Comment h identifies multiple factors that may
influence interpretation of an ambiguous attorney-client agreement, and it
guides our disposition here.  

Comment h does not mandate that
ambiguities in attorney-client contracts always must be construed against the
attorney.  Rather, comment h contemplates reliance on the customary resources
used for contract interpretation, including consideration of the contract
language and surrounding circumstances; the client=s sophistication and experience; the
parties= past practice; and whether the
contract terms were truly negotiated or instead were imposed unilaterally. 
This approach encompasses multiple factors and encourages sensitivity to the
particular circumstances of a particular case.  Comment h ultimately grounds
the analysis on this question: What would Aa reasonable person in the client=s circumstances@ understand or expect?








The Aclient=s circumstances@ in this case do not involve an
unsophisticated individual whose lawyer presented an already-drafted agreement
on a take-it-or-leave-it basis.  To the contrary, this case involves a
sophisticated and experienced client who vigorously negotiated the fee
agreement with an individual attorney after being told the law firm would not
take the case.  The evidence in this case establishes that (1) Van Dyke is an
experienced businessman who had been instrumental in drafting complex contracts
and setting up complex business ventures with national and international
investors; (2) the fee agreement was created through a collaborative process
between Van Dyke and Swonke; (3) the fee agreement=s terms were vigorously negotiated;
(4) all provisions Van Dyke insisted upon were included in the contract; (5)
Van Dyke had experience in retaining attorneys; (6) Greenberg Peden previously
told Van Dyke it no longer would represent Anglo-Dutch due to unpaid legal
bills; and (7) Swonke told Van Dyke that Greenberg Peden specifically refused
to represent Anglo-Dutch in the lawsuit against Halliburton and Ramco.

These circumstances make the present
case an inappropriate vehicle for applying the doctrine of contra
proferentum _ either broadly with respect to all ambiguities that may arise in
connection with attorney-client agreements, or specifically with respect to the
particular ambiguity at issue here regarding the identity of Anglo-Dutch=s contracting counterpart. 
Construing the October 16, 2000 fee agreement from the standpoint of a
reasonable client in the circumstances of Anglo-Dutch=s Van Dyke, there is ample basis for
concluding that such a client would understand Anglo-Dutch had contracted with
an individual lawyer rather than the law firm.  At a minimum, a triable issue
of fact is presented regarding the parties= intent.

b.         Breach
of fiduciary duty

Anglo-Dutch tries to bolster its 
argument for applying contra proferentum by linking that doctrine to
Swonke=s asserted breach of his fiduciary
duty.

Anglo-Dutch argues that the ambiguous
fee agreement should be construed against Swonke because he breached his
fiduciary duty.  Anglo-Dutch contends that Swonke breached his fiduciary duty
by mistakenly drafting an ambiguous fee agreement and then failing to disclose
to Van Dyke his own interpretation of that agreement as an individual contract,
which diverged from Van Dyke=s stated belief that Anglo-Dutch contracted with Greenberg
Peden rather than Swonke individually.

Anglo-Dutch=s argument is hampered by the jury=s finding that Swonke complied with
his fiduciary duty.  Anglo-Dutch=s linkage of contra proferentum
and Swonke=s asserted breach of fiduciary duty makes it appropriate at this juncture
to address Anglo-Dutch=s contention that legally and factually insufficient evidence
supports the jury=s finding in favor of Swonke on this issue.

Jury Question 5 asked:

Did Swonke comply with his fiduciary duty to
Anglo-Dutch?








 

As Anglo-Dutch=s
attorney, Swonke owed Anglo-Dutch a fiduciary duty.  To prove that he complied
with his fiduciary duty, Swonke must show:

 

A.                
The transactions in question were fair and equitable to Anglo-Dutch; 

 

B.                
Swonke made reasonable use of the confidence that Anglo-Dutch placed in
him;

 

C.                
Swonke acted in the utmost good
faith and exercised the most scrupulous honesty toward Anglo-Dutch;

 

D.               
Swonke placed the interests of Anglo-Dutch before his own, did
not use the advantage of his position to gain any benefit for himself at the
expense of Anglo-Dutch, and did not place  himself in any position where his
self-interest might conflict with his obligations as a fiduciary; and 

 

E.                
Swonke fully and fairly disclosed all important information to
Anglo-Dutch concerning the transactions.

 

Answer AYES@ or ANO@:

 

Answer: YES

 

It is worth noting that the jury did
not answer Ano@ to a question asking whether Swonke
breached his fiduciary duty.  In other words, the jury=s answer is not merely a failure to
find actionable conduct in answer to a question that put the burden of proof on
Anglo-Dutch.  Cf. Blizzard v. Nationwide Mut. Fire Ins. Co., 756 S.W.2d
801, 806 (Tex. App.BDallas 1988, no writ) (Athe jury=s negative answer does not establish
the contrary of the question asked;@ it establishes only that the party
with the burden of proof failed to meet that burden).  Rather, the jury here
answered Ayes@ to a question that put the burden of proof on Swonke.  It is an
affirmative finding in Swonke=s favor establishing that he complied with all facets of his
fiduciary duty to Anglo-Dutch C including his duty to Afully and fairly disclose[] . . . all
important information to Anglo-Dutch concerning the transactions.@








We conclude that the evidence is legally
and factually sufficient to support the jury=s Ayes@ answer to Question 5.

Anglo-Dutch asserts that it
conclusively established Swonke=s breach of fiduciary duty because the evidence is undisputed
that Swonke failed to (1) clarify the nature of the fee agreement when the
parties signed it, or explain his view of the terms governing his entitlement
to a fee; (2) respond to Van Dyke=s October 17, 2000 transmittal
letter, which set forth Van Dyke=s divergent view of the fee agreement=s meaning; (3) inform Anglo-Dutch
about his interpretation of the fee agreement after he left Greenberg Peden and
about the repercussions his move would have; (4) inform Anglo-Dutch of a
conflict of interest Swonke created when he began working at McConn & Williams
while considering himself to be exempt from the fee agreement Anglo-Dutch had
with McConn & Williams; (5) consult with Anglo-Dutch regarding the
assignment of rights he negotiated with Greenberg Peden at the time he
negotiated the release; and (6) act with the strictest fairness and honesty
with respect to his fee because he sought to recover a fee five times the
amount Anglo-Dutch reasonably expected to pay. 

As stated above, when conducting a
legal sufficiency review, we must consider the evidence in the light most
favorable to the verdict and indulge every reasonable inference that would
support it.  We will credit favorable evidence if reasonable jurors could do so
and disregard contrary evidence unless reasonable jurors could not do so.  City
of Keller, 168 S.W.3d at 22, 27.  If the evidence at trial would enable
reasonable and fair‑minded people to differ in their conclusions, then
jurors must be allowed to decide the issue.  Id. at 822.  Under the
governing standard and scope of review, we consider the following evidence in
assessing Anglo-Dutch=s contention that the evidence was undisputed and
conclusively established Swonke=s breach of fiduciary duty.








Swonke testified that he explained
his Aof counsel@ status to Van Dyke on several
occasions, although Van Dyke claimed to have no recollection of these
explanations.  Swonke testified _ and Van Dyke acknowledged _ that Greenberg Peden refused to
represent Anglo-Dutch in the lawsuit against Halliburton and Ramco because of
unpaid legal fees.  Swonke testified _ and Van Dyke acknowledged _ that Swonke continued to provide
services in furtherance of the lawsuit after Swonke referred Anglo-Dutch to
McConn & Williams without receiving compensation from Anglo-Dutch.  Swonke
testified _ and Van
Dyke acknowledged _ that Van Dyke approached Swonke asking for Swonke=s help.  

Van Dyke proposed a contingency fee
agreement.  Swonke testified that he wanted a flat fee, but Van Dyke insisted
on computing the fee based on the hourly formula stated in the fee agreement. 
After negotiations, Swonke acquiesced to Van Dyke=s formula but added a rounding-up
feature.  Swonke testified that he and Van Dyke discussed the rounding feature,
and that Van Dyke understood it.  Van Dyke testified that he recommended the
fee agreement be based on the hourly formula and that Swonke proposed the
rounding-up feature. 

According to Swonke, the parties
achieved a meeting of the minds when they entered the fee agreement after Van
Dyke specifically called Swonke and requested his personal services.  Swonke
testified that Van Dyke knew the fee agreement was Swonke=s personal contract with Anglo-Dutch;
knew that no one at Greenberg Peden would do any more work for Anglo-Dutch; and
knew that no one at Greenberg Peden had done any work for Anglo-Dutch since
1999.  Swonke testified that Van Dyke absolutely and without a doubt understood
that Swonke would be paid individually when he moved to McConn & Williams;
Anglo-Dutch had been with Swonke for 15 years and Greenberg Peden had severed
ties with Anglo-Dutch earlier.  Further, when Swonke joined McConn & Williams
as Aof counsel,@ he sent Van Dyke a letter informing
Van Dyke of his move and his intent to take the clients= files to McConn & Williams absent
objections.  Van Dyke did not object to Swonke taking Anglo-Dutch=s files with him to McConn &
Williams.  








Swonke also testified that he
complied with his fiduciary duty to Anglo-Dutch.  Swonke stated that he (1) was
perfectly honest with Van Dyke about any fee arrangements; (2) did not engage
in any self-dealing; (3) did not do anything concerning the fee agreement that
was to his advantage but to Anglo-Dutch=s disadvantage; (4) never received
any benefit for the work he performed on behalf of Anglo-Dutch in the lawsuit;
(5) acted with absolute candor and honesty, and without any concealment or
deception toward Anglo-Dutch; (6) provided Anglo-Dutch his undivided loyalty;
(7) never failed to inform Van Dyke of matters material to the representation;
and (8) never believed there was a conflict of interest in this case. 

This evidence entitled the jury to
conclude that the transaction was fair and equitable to Anglo-Dutch, and that
Swonke fully and fairly disclosed all important information regarding the terms
of the fee agreement.  The jury was entitled to conclude that Van Dyke knew the
fee agreement was between Anglo-Dutch and Swonke individually, and that no
further disclosure was necessary.  Further, the testimony entitled the jury to
find that Swonke acted with fairness, loyalty, and honesty toward his client
Anglo-Dutch, and that he did not create any conflict of interest when he moved
to McConn & Williams; his move had no effect on the parties= relationship because the fee
agreement was between Anglo-Dutch and Swonke individually, and would follow him
wherever he chose to practice as of counsel.  

Additionally, Swonke testified that
he did not respond to Van Dyke=s October 17, 2000 transmittal letter because he did not see
it.  Swonke testified that he normally would not read a letter that refers to a
document he already had in his files.  Swonke stated that he would have
responded to the letter if he had seen it and had thought Van Dyke was
contending the fee agreement was with Greenberg Peden.  Swonke testified that
Van Dyke=s assertion of a fee agreement
between Greenberg Peden and Anglo-Dutch was suspicious because both knew that
the fee agreement was between Anglo-Dutch and Swonke individually.  According
to Swonke, it is not possible that Van Dyke was simply expressing his belief in
the transmittal letter because Van Dyke had continued calling Swonke for help
with the Halliburton lawsuit.  When Swonke became tired of helping Van Dyke
without compensation, Van Dyke asked Swonke for help and proposed the fee
agreement without anyone at Greenberg Peden knowing about it.








This evidence entitled the jury to conclude
that Swonke never saw the October 17, 2000 letter and, therefore, did not have
to take further steps to disclose information to Anglo-Dutch regarding its
contracting counterpart.

Swonke also testified that when he
told Van Dyke he wanted to be included on the settlement distribution list, Van
Dyke asked Swonke to obtain a release from Greenberg Peden.  According to
Swonke, Van Dyke insisted that Swonke get a release to prevent the law firm
from making a claim against Anglo-Dutch because the fee agreement was printed
on Greenberg Peden letterhead.  Swonke drafted a release and assignment to
address Van Dyke=s request.  Swonke explained that he was acting as
Anglo-Dutch=s attorney and was trying to draft exactly what Van Dyke requested.
Swonke testified that there was nothing in the release document to cause
concern to an attorney representing Anglo-Dutch.

This evidence entitled the jury to
conclude that Swonke obtained the Assignment and Release Agreement at Van Dyke=s insistence; that Swonke made
reasonable use of the confidence Anglo-Dutch placed in him; that he acted in
the utmost good faith; and that he did not use the advantage of his position to
gain any benefit for himself at the expense of Anglo-Dutch.

Having reviewed the evidence and
considered that the jury is the sole judge of the credibility of the witnesses,
we conclude that the evidence is legally sufficient because it would enable
reasonable and fair-minded people to find that Swonke complied with his
fiduciary duty to Anglo-Dutch.

Alternatively, Anglo-Dutch argues
that the evidence in this case is factually insufficient to support the jury=s finding that Swonke complied with
his fiduciary duty. 








In addition to the evidence discussed
above, Anglo-Dutch relied on testimony from a fiduciary duty expert, Robert
Schuwerk.  He testified that Swonke had a duty to clarify who the contracting
parties were because the fee agreement was on Greenberg Peden letterhead and
contained the firm=s signature block.  Schuwerk opined that Swonke owed a
fiduciary duty to clear up any misunderstanding regarding who the contracting
parties were _ if he
received the October 17, 2000 transmittal letter from Van Dyke.  Schuwerk could
not point to any case or treatise establishing that an attorney breaches his
fiduciary duty by not acting on a document he never saw or read.  Schuwerk
declined to opine on whether Swonke breached his fiduciary duty if he had not
seen or read the October 17, 2000 transmittal letter.

Schuwerk also testified that Swonke
owed a duty to write a new contract when he left Greenberg Peden for McConn
& Williams, and to explain how the move might affect Anglo-Dutch=s obligation to pay legal fees.  He
opined that Swonke should have redone the fee agreement even if Swonke and Van
Dyke both knew the fee agreement was an individual contract.  Swonke testified
that it would have been Aludicrous@ to redo the fee agreement because it was Swonke=s individual agreement.

Having reviewed all the evidence
before us and considered that the jury is the sole judge of the credibility of
the witnesses, we conclude that the jury=s Ayes@ answer to Question 5 was supported
by factually sufficient evidence.  Accordingly, we conclude that the evidence
was legally and factually sufficient to support the jury=s finding that Swonke complied with
his fiduciary duty.

In light of the jury=s amply supported answer to Question
5, we reject Anglo-Dutch=s argument that Swonke=s asserted breach of fiduciary duty
justifies applying contra proferentum and construing the ambiguous
October 16, 2000 fee agreement against Swonke.  The finding that Swonke
complied with his fiduciary duty reinforces our decision to forego reliance on contra
proferentum and to refrain from automatically construing the ambiguous fee
agreement against Swonke.  The trial court properly left this issue to the jury=s resolution.

2.         Evidence
supports the finding that Swonke contracted individually

We now turn to Anglo-Dutch=s argument that legally and factually
insufficient evidence supports the jury=s finding that the fee agreement is
between Anglo-Dutch and Swonke individually.

Question 1 asked and instructed the
jury as follows:








Do you find that the Fee Agreement with Anglo-Dutch
(Plaintiffs= Exhibit 1) was entered into on behalf of Greenberg
Peden, or on behalf of Swonke, individually?

 

You must decide the agreement=s meaning by determining the intent of the parties at
the time of the agreement.  Consider all the facts and circumstances
surrounding the making of the agreement, the interpretation placed on the
agreement by the parties, and the conduct of the parties.

 

As to your two choices below, you must answer AYES@ as to only
one, and ANO@ as to the
other

 

Answer:          NO on behalf of Greenberg Peden

YES on behalf of Swonke, individually

 

Anglo-Dutch argues that the evidence
does not support the jury=s answer to Question 1.  As noted above, we will sustain no
evidence challenges when the record discloses: (a) a complete absence of
evidence of a vital fact; (b) the court is barred by rules of law or of
evidence from giving weight to the only evidence offered to prove a vital fact;
(c) the evidence offered to prove a vital fact is no more than a mere
scintilla; or (d) the evidence establishes conclusively the opposite of the
vital fact.  City of Keller, 168 S.W.3d at 810. Ultimately, our review
will focus on whether the evidence would enable reasonable and fair‑minded
jurors to find that the fee agreement was entered on behalf of Swonke
individually.  Id. at 827.           








Anglo-Dutch first contends that A[t]he only evidence offered at trial
by Swonke in support of the alleged ambiguity amounts to no evidence.@  This argument appears to correspond
to situation (b) identified above.  Anglo-Dutch asserts that the use of
personal pronouns in the fee agreement is no evidence because the fee agreement
is unambiguous C an argument we already have rejected.  Anglo-Dutch also
contends that Van Dyke=s deposition testimony in the Halliburton lawsuit, in which
he stated that he had a fee contract with Swonke, does not support or create an
ambiguity and thus constitutes no evidence because it related to a different
topic _ the number and rough identity of the
fee contracts that Anglo-Dutch had at the time.  We reject this contention
because the jury was entitled to consider this testimony and its context; that
context does not prevent reasonable and fair-minded jurors from relying upon it
to answer Ayes@ as to Swonke in response to Question 1.

Anglo-Dutch next contends that the
only competent evidence in the record conclusively shows that the fee agreement
always was intended to be between Anglo-Dutch and Greenberg Peden.  This
argument corresponds to situation (d) set out above because it asserts that the
evidence conclusively establishes the opposite of a vital fact.

Under this challenge, Anglo-Dutch
asserts that the Assignment and Release Agreement obtained from Greenberg Peden
on April 16, 2004 reveals the parties= true intent.  That assignment and
release says Swonke signed the fee agreement on behalf of the law firm; that
the firm assigned any interest under the fee agreement to Swonke; and that the
firm released Anglo-Dutch from liability to Greenberg Peden for fees under the
fee agreement.  Anglo-Dutch argues that Swonke would not have needed an
assignment of rights if he believed he had an individual fee agreement with
Anglo-Dutch and the rights already belonged to him.  Anglo-Dutch contends that
Greenberg Peden shareholder Skip Naylor acknowledged that the fee agreement was
executed on behalf of the firm. 

Anglo-Dutch also stresses that other
contingency fee agreements Swonke signed in his individual capacity were
printed on Swonke=s own letterhead.  It further argues that Swonke=s outward appearance and behavior
indicated he was employed by Greenberg Peden while working on Anglo-Dutch
matters; this included his billing practices, recording time on the firm=s system, using the firm=s paralegals, and using the firm to
bill Anglo-Dutch for expenses relating to the Halliburton lawsuit.  Anglo-Dutch
contends that its execution of a promissory note in favor of Greenberg Peden C and not Swonke individually C for the outstanding legal fees it
owed confirms that Swonke worked on Anglo-Dutch matters through the firm and
not individually.  Additionally, Swonke=s letter informing Anglo-Dutch of his
move to McConn & Williams stated that his legal services had been provided Athrough [his] association with
Greenberg Peden P.C.@








Van Dyke further suggested in his
testimony that Anglo-Dutch agreed to the rounding feature in the formula for
calculating the fee only as a reward to Greenberg Peden for its forbearance on
prior unpaid legal bills.  He also pointed to the October 17, 2000 transmittal
letter he sent to Swonke, which he portrays as confirmation the parties
intended the fee agreement to be between Anglo-Dutch and Greenberg Peden. 
Lastly, Anglo-Dutch contends that, after Swonke moved to McConn & Williams,
he maintained every appearance of acting as a McConn & Williams attorney
using the firm office space, letterhead, e-mail account and billing system. 
According to Anglo-Dutch, this gave Anglo-Dutch no reason to believe Swonke
was  employed individually under the terms of the October 16, 2000 fee
agreement.

This evidence does not rise to the
level of allowing Aonly one logical inference@ in favor of a finding that
Anglo-Dutch contracted with Greenberg Peden.  See City of Keller, 168
S.W.3d at 822.  Swonke=s testimony provided contrary evidence and established that
more than one inference was permissible in this case.  The choice between these
competing narratives belonged to the jury.  We will not disturb that choice.








Swonke testified that the Assignment
and Release Agreement was drafted only because of Van Dyke=s Ahypersensitivity@ and concern that Greenberg Peden
would attempt to assert a right to fees under the October 16, 2000 fee
agreement.  When Swonke told Van Dyke that he wanted to be included on the
settlement distribution list, Van Dyke insisted that Swonke first obtain a
release from Greenberg Peden because the fee agreement was on firm letterhead
and Van Dyke was worried that the firm would make a claim against Anglo-Dutch. 
Swonke and Greenberg Peden shareholder Skip Naylor drafted a release and assignment
to address Van Dyke=s request.  Swonke testified that he prepared a release and
an assignment because an assignment had to occur before there could be a
release, and Swonke and Naylor were trying to draft a document that would give
Van Dyke the comfort he sought.  Swonke testified that the release implicitly
required an assignment of rights to place Swonke and Anglo-Dutch in the
position Van Dyke, Swonke and Greenberg Peden believed they should occupy.  Naylor
explained that the language in the document was there to assure Van Dyke that,
when Anglo-Dutch paid Swonke, it would owe Greenberg Peden nothing. 

Swonke=s practice was to use his personal
letterhead whenever he entered into an individual contingency fee agreement
with a new client, and Anglo-Dutch was not a new client.  Further, Swonke
testified that Van Dyke knew he was Aof counsel@ to Greenberg Peden because he
explained the meaning of his Aof counsel@ status to him on several occasions, including once while Van
Dyke worked at his father=s company in the late 1980s.  Swonke=s work as Aof counsel@ was billed through Greenberg Peden=s billing system; under the fee
sharing arrangement between Swonke and Greenberg Peden, the firm would deduct a
certain percentage of the fees the clients paid to reimburse Greenberg Peden,
among others, for using office space, paralegals, secretaries, and parking.

Swonke told Van Dyke he generated his
own work, did not get a salary from the firm, and was paid only when the
clients paid. Swonke told Van Dyke he was not part of the firm, despite
appearances that Swonke had Aall the trappings of the firm.@  Further, Naylor testified that
sending Anglo-Dutch a bill for Halliburton lawsuit expenses was simply a
mistake on Greenberg Peden=s part. 

Additionally, Swonke testified that
Van Dyke proposed a contingency fee agreement. Although Swonke suggested his
usual flat percentage fee, Van Dyke insisted on the formula stated in the fee
agreement.  Swonke initially rejected the formula because he thought it was too
complicated, but later acquiesced to it because Van Dyke thought this would be
the only fair way to measure Swonke=s hours.  Swonke added a rounding
feature because he knew Van Dyke had a propensity for Aputting decimals out there to a long
degree.@ 

According to Swonke, Van Dyke
absolutely and without a doubt knew that Swonke would be paid individually when
he moved from Greenberg Peden to McConn & Williams.  Swonke also sent Van
Dyke a letter informing him of Swonke=s move to McConn & Williams as Aof counsel@ and Swonke=s intention to take Anglo-Dutch=s files with him unless Anglo-Dutch
objected.








Finally, Swonke testified that he did
not see the October 17, 2000 transmittal letter because it transmitted the
McConn & Williams contingency fee agreement, which Swonke already had in
his file.  Normally, Swonke would not read a letter that refers to a document
he already had in his files.  Swonke stated that he would have responded to the
letter if he had thought Van Dyke was contending the fee agreement was not with
Swonke individually. 

From this evidence, the jury was
entitled to conclude that Van Dyke knew the implications of Swonke=s Aof counsel@ status at Greenberg Peden and McConn
& Williams because Swonke had explained the meaning of his status before
they signed the October 16, 2000 fee agreement.  The jury also was entitled to
conclude that executing the promissory note in favor of Greenberg Peden was
consistent with the Aof counsel@ arrangement Swonke had with the firm.  

The jury could conclude that the fee
agreement=s rounding feature was included to not as a reward for Greenberg Peden=s forbearance, but as a means of
addressing Van Dyke=s propensity for Aputting decimals out there to a long
degree.@  The jury could further conclude
that Swonke never saw Van Dyke=s October 17, 2000 transmittal letter until after the dispute
arose.  Finally,  the jury was entitled to conclude that Swonke obtained the
Assignment and Release Agreement only at Van Dyke=s insistence to calm his fear that
Greenberg Peden would assert an interest in the fee agreement, and that Swonke
was willing to satisfy all of Van Dyke=s demands to get paid under the fee
agreement.

Therefore, the evidence does not
conclusively establish that the parties always intended the fee agreement to be
between Anglo-Dutch and Greenberg Peden; and Anglo-Dutch cannot assert a
successful legal sufficiency challenge based on this argument.

Lastly, we conclude that Anglo-Dutch
cannot prevail on a no evidence challenge described in situations (a) and (c)
under Chief Justice Calvert=s formulation applied above in City of Keller.  The
vital fact at issue here is whether the parties intended the fee agreement to
be between Anglo-Dutch and Greenberg Peden, or between Anglo-Dutch and Swonke
individually.








More than a scintilla of evidence
supports the jury=s answer to Question 1.  This evidence includes consistent
use of personal pronouns throughout the fee agreement against a backdrop of
undisputed evidence that Van Dyke repeatedly was told Greenberg Peden would not
represent Anglo-Dutch due to unpaid legal bills.  These circumstances give the
choice of personal pronouns added significance, and the jury was entitled to
consider these circumstances.  

This evidence also includes Van Dyke=s 2002 deposition testimony in the
Halliburton lawsuit.  Van Dyke testified that Anglo-Dutch had two contingency
fee contracts: one with John O=Quinn, Jett Williams, and Luke McConn, and the other with
Swonke.  Van Dyke did not mention Greenberg Peden in his deposition testimony. 
Van Dyke=s deposition testimony reasonably can
be read to conflict with his trial testimony; deciding the credibility of
witnesses and the weight to be given to conflicting testimony is left to the
jury=s discretion.  See City of Keller,
168 S.W.3d at 819.  There is more than a scintilla of evidence to support the
jury=s finding that Anglo-Dutch contracted
with Swonke individually when it agreed to pay attorney=s fees and Swonke agreed to work on
the Halliburton lawsuit.

Further, on the record before us,
Anglo-Dutch cannot show a complete absence of evidence establishing the vital
fact that Anglo-Dutch and Swonke intended to contract for payment of Swonke=s individual services rather than the
services of Greenberg Peden.  Evidence establishing this vital fact constitutes
much more than a scintilla and includes the following.

In 1999 or early 2000, Swonke and
David Peden had a meeting with Van Dyke at which Peden expressly told Van Dyke
that Greenberg Peden no longer would perform legal work for Anglo-Dutch due to
unpaid legal bills.  No one at Greenberg Peden had performed legal work for
Anglo-Dutch since 1999.








In February or March of 2000,
Greenberg declined to represent Anglo-Dutch in the Halliburton lawsuit on an
hourly and contingency fee basis due to the unpaid bills.  Van Dyke admitted
that Swonke informed him of Greenberg Peden=s refusal.  Swonke testified that,
after Anglo-Dutch signed a contract with McConn & Williams, he did not want
to be involved with the Halliburton lawsuit but Van Dyke and McConn &
Williams attorneys continued to call him for advice and help.

When Swonke became weary of providing
legal services without compensation, Van Dyke called him and asked for his
personal services.  Swonke testified that Van Dyke knew no one at Greenberg
Peden would help him, and that Van Dyke intended to hire Swonke individually. 
Van Dyke proposed the fee agreement and the parties negotiated the terms. 
Swonke also testified that the use of firm letterhead and signature block made
no difference because he, Van Dyke and Greenberg Peden all knew that
Anglo-Dutch was contracting with Swonke individually.

Swonke consistently maintained that
he was working for Anglo-Dutch individually and consistently demanded payment
for his legal work on that basis.  This was also evident from Swonke=s e-mails and other written
correspondence with Van Dyke and others after the Halliburton lawsuit was
settled.  Swonke testified that, before the meeting on April 24, 2002, Van Dyke
never mentioned that he thought the fee agreement was with Greenberg Peden. 

In addition to this testimony from
Swonke, there is other evidence the jury could have relied upon in determining
the parties= intent.  

Naylor and Peden both testified that
the fee agreement was between Anglo-Dutch and Swonke individually.  Naylor
stated that the Greenberg Peden letterhead does not determine the identity of
parties to the fee agreement because the firm had refused to be involved in the
Halliburton lawsuit and Van Dyke knew that; therefore, the fee agreement
described how Swonke individually would assist Anglo-Dutch in the Halliburton
lawsuit and not how the firm would assist Anglo-Dutch.  Naylor reiterated that,
despite the use of firm letterhead, Van Dyke knew the firm would not represent
Anglo-Dutch and Swonke would do so. 








The jury also heard testimony from
Nancy Strong, a McConn & Williams attorney, who worked on the Halliburton
lawsuit.  She testified that she became aware that Anglo-Dutch resisted paying
Swonke because Van Dyke was not taking Swonke=s calls or calling him back after
having talked to him on a daily basis for years.  She told Swonke that Van Dyke
would try to renegotiate his contract and pay less than what he bargained for
as he had done with all the other people he dealt with, including McConn &
Williams in a previous matter and the Anglo-Dutch investors. 

Based on our review of the record, we
conclude that the evidence in this case is legally sufficient because it would
enable reasonable and fair-minded jurors to find that Anglo-Dutch contracted
with Swonke individually.  See City of Keller, 168 S.W.3d at 827.  The
evidence also is factually sufficient to support the jury=s answer to Question 1.  After
considering and weighing all the evidence, we conclude that the evidence is not
so weak and the finding that the parties intended the fee agreement to be
between Anglo-Dutch and Swonke individually is not so against the great weight
and preponderance of the evidence as to be clearly wrong and manifestly unjust.

We overrule Anglo-Dutch=s second and fifth issues.

C.        Jury
Instructions

In its third issue, Anglo-Dutch seeks
reversal and a new trial on grounds that the trial court erroneously refused
Anglo-Dutch=s requests for additional instructions to accompany Question 1. 
Anglo-Dutch contends that the trial court should have submitted additional
instructions applicable to Question 1 identifying the relevant fiduciary duties
an attorney owes to a client, along with Aa generally applicable instruction on
the >presumption of unfairness= that automatically arises when an
attorney contracts with an existing client.@

Anglo-Dutch asked the trial court to
include Ageneral@ instructions applicable to Questions
1, 2, and 3.  This cluster of questions pertained to the identity of the
contracting parties, failure to comply with the fee agreement, and contract
damages.  Anglo-Dutch requested the following Ageneral@ instructions:

You are instructed that a law firm and its lawyers,
including any AOf Counsel@
lawyers who provide services for clients of that firm, owe a fiduciary duty to
the client.  A lawyer who works as an AOf
Counsel@ to a law firm is treated under the law as an employee
of that firm.








A lawyer owes a fiduciary duty to a client and must
act with integrity and fidelity and in the best interest of his client.  Some
of the fiduciary duties a lawyer owes his client include the: 

 

1. duty to be strictly and perfectly honest about fee
arrangements and to refrain from self-dealing;

 

2. duty to act with absolute candor, openness,
honesty, and without any concealment or deception; 

 

3. duty to represent the client with undivided
loyalty, keeping the client=s best interest
in mind;

 

4. duty to inform the client of matters material to
representation;

 

5. duty to provide the client at the outset with a
clear and accurate explanation of the basis or rate of the fee to be charged
under the fee agreement and how it is to be calculated;

 

6. duty to timely inform the client of a conflict of
interest.

 

You are further instructed that, with regard to the
fee agreement in question, it is the attorney=s and law firm=s burden to provide that the attorney and law firm
acted with perfect fairness, adequacy, and equity with regard to the client. 
Where self-dealing on the part of the attorney and/or the law firm is alleged
by the client, a presumption of unfairness automatically arises and it is the
attorney=s and law firm=s
burden to prove (a) that the questioned transaction was made in good faith, (b)
for a fair consideration, and (c) after full and complete disclosure of all
material information to the client. 

 

You are further instructed that attorneys, law firms,
and attorneys performing services as AOf
Counsel@ to a law firm have a duty, at the beginning of
representation of a client on a contingency fee matter, to inform that client
of the basis or rate of the contingency fee.  Also, the attorney must inform
the client about the implication of a contingency fee agreement.

 

Anglo-Dutch also asked the trial
court include the following instructions as part of Question 1:








In answering this question, you are instructed that
the agreement must be construed as a reasonable person in the circumstances of
the client would have construed it.

 

You are further instructed that the obligation of
clarifying attorney-client contracts falls on the attorney because of the
attorney=s greater knowledge and experience with respect to fee
arrangements and because of the trust the client has placed in the attorney.

 

The trial court refused Anglo-Dutch=s requests.

Because a trial court enjoys wide
discretion in determining which instructions should be included in the jury
charge, our review is limited to determining whether the court acted without
reference to any guiding rules or principles.  See Tex. A & M Univ. v.
Chambers, 31 S.W.3d 780, 783 (Tex. App.CAustin 2000, pet. denied).  A trial
court=s asserted error in refusing an
instruction is reversible only if it probably caused the rendition of an
improper judgment.  Tex. R. App. P. 44.1; Dew, 208 S.W.3d at 456. 

We conclude that the trial court
acted within its discretion when it refused Anglo-Dutch=s requested additional instructions. 
Further, any asserted error in refusing the requested instructions was
harmless.








With respect to the construction
placed upon the fee agreement by a reasonable person in the client=s circumstances, Question 1 already
included a broad instruction that told the jury to A[c]onsider all of the facts and
circumstances surrounding the making of the agreement, the interpretation
placed on the agreement by the parties, and the conduct of the parties.@  The existing instruction
encompassed the client=s perspective of the fee agreement, and the trial court was
not obligated to provide further instructions tailored to a particular litigant=s liking.  Similarly, the trial court
acted within its discretion by rejecting the requested instruction pertaining
to treatment of an Aof counsel@ attorney as a firm employee.  Even assuming for argument=s sake that this is a correct
statement of the law, not every correct statement of the law belongs in the
jury charge.  A requested instruction can set forth a correct statement of the
law and still be unnecessary in the charge.  See Acord v. General Motors
Corp., 669 S.W.2d 111, 116 (Tex. 1984); Maddox v. Denka Chem. Corp.,
930 S.W.2d 668, 671 (Tex. App.CHouston [1st Dist.] 1996, no writ).  The trial court acted
within its discretion when it refused to include this unnecessary additional
statement.

The remaining requested instructions
pertain to Swonke=s fiduciary duty.  Anglo-Dutch=s request to include Ageneral@ fiduciary duty instructions
applicable to Question 1 is another manifestation of Anglo-Dutch=s larger effort to link the contract
interpretation issue with its contention that Swonke breached his fiduciary
duties.

We already have concluded that Swonke=s asserted breach of his fiduciary
duty does not influence the manner in which the fee agreement is interpreted in
this case.  The trial court submitted a separate fiduciary duty question and
accompanying instructions describing the facets of that duty in Question 5. 
The jury answered Ayes@ to Question 5, which (a) asked whether Swonke complied with
his fiduciary duty to Anglo-Dutch, and (b) placed the burden on Swonke to
justify his conduct and establish his compliance with his fiduciary duty. 
Legally and factually sufficient evidence supports the jury=s Ayes@ answer to Question 5.  The
instructions accompanying Question 5 describe the fiduciary duty that
Anglo-Dutch sought to apply to Question 1 via its requested instructions.  The
trial court acted within its discretion in submitting fiduciary duty
instructions as part of Question 5, and in refusing to submit another set of
fiduciary duty instructions applicable to Question 1.  

In any event, the asserted charge
error in refusing to include fiduciary duty instructions applicable to Question
1 was harmless because fiduciary duty instructions were submitted as part of a
separate question that the jury answered adversely to Anglo-Dutch.  See
Times Herald Printing Co. v. A.H. Belo Corp., 820 S.W.2d 206, 214 (Tex.
App.CHouston [14th Dist.] 1991, no writ)
(omission of requested instructions was harmless in light of separate question
that applied requested legal standard and was answered adversely to party
seeking the instructions).

We overrule Anglo-Dutch=s third issue.








D.        Admission of Evidence

In its fourth issue, Anglo-Dutch
asserts that a new trial is required because the trial court erroneously
admitted evidence regarding other litigation involving Anglo-Dutch. 
Specifically, Anglo-Dutch challenges the trial court=s admission of evidence relating to
(1) Ainvestor lawsuits,@ Alawsuit funding agreements,@ or AAnglo-Dutch=s payment, nonpayment, or attempts at
resolving any claims related thereto;@ (2) investor Michael Lore=s testimony; and (3) any unpaid fees
to McConn & Williams or any other law firm.

Because we review a trial court=s admission of evidence for abuse of
discretion, In re J.P.B., 180 S.W.3d at 575, we must uphold the
evidentiary ruling if there is any legitimate basis in the record to support
it.  Owens‑Corning Fiberglas Corp., 972 S.W.2d at 43.  We will not
reverse a trial court for an erroneous evidentiary ruling unless the error was
reasonably calculated to cause and probably did cause the rendition of an
improper judgment.  See Tex. R. App. P. 44.1; see also Gee, 765
S.W.2d at 396.

We conclude that the trial court
acted within its discretion in admitting the challenged evidence.  A key issue
at trial focused on the parties= intent in signing the fee agreement in light of the
surrounding facts and circumstances.  Those facts and circumstances included
the challenged evidence, which related in significant part to the parties= sophistication and intent.  We
cannot say that the trial court abused its discretion in admitting evidence
relating to the lawsuit funding agreements and investor lawsuits, or investor
Michael Lore=s testimony.  

Additionally, any error in admitting
the challenged evidence was harmless because it was introduced at different
stages of the trial without objection by Anglo-Dutch.  See Volkswagen
of Am., Inc. v. Ramirez, 159 S.W.3d 897, 907 (Tex. 2004) (error in
admission is deemed harmless if the objecting party permits the same or similar
evidence to be introduced without objection).








The trial court admitted evidence
that Anglo-Dutch had entered into lawsuit funding agreements with investors to
offset Anglo-Dutch=s expenses during prosecution of the Halliburton lawsuit. 
The trial court reasoned that this evidence tended to show Swonke=s individual legal work with respect
to Anglo-Dutch=s investors.  Evidence regarding these same lawsuit funding agreements
was later admitted by the trial court without objection when Van Dyke testified
that he instructed Swonke to draft releases for investors to encourage them to
take less than they agreed to in their lawsuit funding agreements so that the
Halliburton lawsuit could be settled.  Van Dyke also testified without
objection that he did not pay any of the 33 investors the amounts contracted
for in the funding agreements.  Further, the trial court admitted evidence that
investors in the Halliburton lawsuit had sued Anglo-Dutch because it did not
pay them the amounts for which they had contracted.  Without objection, the
jury was later again informed of these investor lawsuits.

With respect to Michael Lore=s testimony, the trial court found
that it was admissible for the limited purpose of stating that he was an
investor; of impeaching Van Dyke=s testimony in which he claimed the
investors were happy with the payment they had received from Anglo-Dutch; and
in rebuttal to McConn=s assertion that Van Dyke was a fine man.  Lore testified
that he was displeased when Van Dyke asked him to accept less than he
contracted for; that he didn=t sign the release Van Dyke requested; that he was never told
the Halliburton settlement amount by Van Dyke; that he sued Anglo-Dutch to
recover the amount originally contracted for; that and he did not think Van
Dyke was a fine man.  Only during cross-examination by Anglo-Dutch=s attorney did Lore answer more
particular questions regarding his investor lawsuit.








Nancy Strong testified without
objection that a dispute arose between Van Dyke and McConn & Williams
because he failed to pay the entire legal bill after the firm had successfully
represented Van Dyke in an unrelated lawsuit against OPIC, one of Anglo-Dutch=s Tenge Field project partners. 
Strong also testified that Van Dyke owed the law firm of Looper Reed legal fees
for its work in the lawsuit against OPIC.[6] 
Swonke testified without objection that Van Dyke could not hire the Looper Reed
law firm to represent Anglo-Dutch in the Halliburton lawsuit because Aas it turn[ed] out, he owed Looper
Reed quite a bit of money, too.@

Finally, Anglo-Dutch has not
established on this record that the verdict turned on the challenged evidence. 
See City of Brownsville, 897 S.W.2d at 753‑54.  This trial was in
significant part a credibility battle based on the jury=s assessment of Swonke and Van Dyke. 
Both testified at length.  Anglo-Dutch has not demonstrated that the admission
of evidence regarding collateral agreements and disputes during a lengthy trial
featuring voluminous evidence likely caused the rendition of an improper
judgment.

We overrule Anglo-Dutch=s fourth issue.

Conclusion

We hold that the October 16, 2000 fee
agreement was ambiguous with respect to whether Anglo-Dutch contracted with
Swonke individually or with Greenberg Peden.  The trial court properly refused
to construe the ambiguous fee agreement against Swonke and properly submitted
this issue to the jury.  Legally and factually sufficient evidence supports the
jury=s finding that Swonke individually is
a party to the fee agreement with Anglo-Dutch, and that Greenberg Peden is
not.  Legally and factually sufficient evidence supports the jury=s finding that Swonke complied with
his fiduciary duty to Anglo-Dutch.  Anglo-Dutch=s charge and evidentiary complaints
provide no basis for reversal.  

We affirm the trial court=s judgment.

 

 

/s/        William J. Boyce

Justice

 

Judgment rendered and Opinion filed
August 26, 2008.

Panel consists of Justices Fowler and
Boyce and Senior Justice Hudson.[7]








 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 








 

 

 

 

 

 









[1]           Swonke in fact joined a predecessor firm,
which changed its name and composition from time to time.  Because these
changes do not affect the disposition of this appeal, we refer to AGreenberg Peden@
throughout this opinion.





[2]           In June 2001, Anglo-Dutch signed a
promissory note in favor of Greenberg Peden for $231,749.16.  Anglo-Dutch paid
the note with interest in December 2003, about two years after Greenberg Peden
had dissolved.





[3]           This settlement spawned a separate series
of lawsuits and appeals involving investors who signed litigation funding
agreements in return for a portion of Anglo-Dutch=s recovery from the lawsuit against Halliburton and Ramco.  After the
jury returned its verdict against Halliburton and Ramco, Anglo-Dutch sought to
reduce amounts it owed to investors who financed the lawsuit and a number of
those investors sued Anglo-Dutch.  See Anglo-Dutch Petroleum Int=l, Inc. v. Smith, 243 S.W. 3d 776 (Tex. App.CHouston
[14th Dist.] 2007, pet. filed); Anglo-Dutch Petroleum Int=l, Inc. v. Littlemill Limited, No. 14-06-00921-CV, 2007 WL 2826900 (Tex. App.CHouston [14th Dist.] Oct. 2, 2007, pet.  filed); Case
Funding Network, L.P. v. Anglo-Dutch Petroleum Int=l, Inc.,
No.  01-06-00960-CV, 2007 WL 2264606 (Tex. App.CHouston [1st Dist.] August 9, 2007, pet.  filed); Anglo-Dutch
Petroleum Int=l, Inc. v. Haskell, 193 S.W.3d 87 (Tex. App.CHouston
[1st Dist.] 2006, pet. denied).  Anglo-Dutch=s
judgment against Ramco was reversed on appeal.  See Ramco Oil & Gas Ltd.,
207 S.W.3d at 827.  

 





[4]           The jury did not answer Question 4, asking
what sum of money would compensate Greenberg Peden for its damages that resulted
from Anglo-Dutch=s failure to comply with the fee agreement, because it
was conditioned on finding that the fee agreement was entered into on behalf of
Greenberg Peden and not Swonke individually.  The jury did not answer Question
6, asking the jury to determine the amount of Swonke=s fees under the fee agreement, because Question 6 was
conditioned on the jury answering Question 5 in the negative and not answering
Question 3 with a dollar amount.  Further, the jury did not answer Question 7,
asking if clear and convincing evidence showed that Anglo-Dutch=s harm resulted from malice or fraud, because it was
conditioned on the jury answering Question 5 in the negative.  Lastly, the jury
did not answer Question 8, addressing exemplary damages against Swonke for the
harm Anglo-Dutch suffered from Swonke=s
conduct, because it was conditioned on the jury answering Question 7 in the
affirmative.

 





[5]           Anglo-Dutch does not challenge on appeal
the jury=s finding that it breached the fee agreement; the
amount of contract damages awarded for that breach; or the separate statutory
fee award for litigating Swonke=s contract
claim under the disputed fee agreement, which the parties opted to try to the
court.  Anglo-Dutch also does not challenge the rendition of a take-nothing
judgment in favor of Greenberg Peden.





[6]           Anglo-Dutch objected to this testimony only
on hearsay grounds.





[7]           Senior Justice J. Harvey Hudson sitting by
assignment.